UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-11272-RGS

UNILOC 2017, LLC

v.

PAYCHEX, INC.
––––

CIVIL ACTION NO. 19-11278-RGS

UNILOC 2017, LLC

v.

ATHENAHEALTH, INC.
––––

MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

May 11, 2020

STEARNS, D.J.

    In these two parallel intellectual property cases, plaintiff Uniloc 2017,

LLC (Uniloc), accuses defendants Paychex, Inc., and athenahealth, Inc., of

infringing U.S. Patents Nos. 6,324,578 (the '578 patent) and 7,069,293 (the '293 patent).[1]  Before the court are the parties' claim construction briefs.[2]

## BACKGROUND

The asserted '578 patent issued on November 27, 2001, from an application filed on December 14, 1998.  The '578 patent is titled "Method, Systems and Computer Program Products for Management of Configurable Application Programs on a Network," and lists as inventors David Cox, Kent Hayes, Jr., David Kaminsky, and David Lindquist.  Related U.S. Patent No. 6,728,766 (the '766 patent) is a divisional of the '578 patent.  The '766 patent was filed on April 10, 2001, and issued on April 27, 2004.  The divisional patent is titled "Methods, Systems and Computer Program Product for License Use Management on a Network," and identifies Cox, Kaminsky, and Lindquist as inventors.

Also on December 14, 1998, inventors Cox, Hayes, and Lindquist, together with John McGarvey and Abdi Salahshour, filed a second application that issued on January 21, 2003 as related U.S. Patent No.

---

[1] The asserted patents were originally assigned to IBM, and eventually reassigned to Uniloc with a reservation of rights for IBM and its business partners.  A third concurrently filed lawsuit, against Akamai, was dismissed pursuant to the terms of the assignment agreement.  *See Uniloc 2017, LLC v. Akamai Tech., Inc.*, No. 19-11276, Dkt # 44 (D. Mass. Dec. 12, 2019).

[2] Defendants submitted joint claim construction briefing.

6,510,466 (the '466 patent). The '466 patent is titled "Methods, Systems and Computer Program Products for Centralized Management of Application Programs on a Network." A divisional application to the '466 patent was filed on May 31, 2001, and issued as the asserted '293 patent on June 27, 2006. The '293 patent is titled "Methods, Systems and Computer Program Products for Distribution of Application Programs to a Target Station on a Network," and lists the same five inventors.[3]

The '578 and '466 patents self-identify as related and incorporate each other by reference. *See* '578 patent, col. 1, ll. 10-14 & col. 7, ll. 17-21; '466 patent, col. 1, ll. 9-13 & col. 7, ll. 43-48. The relationships between the four patents, as relevant to the discussion, *infra*, may be visualized as follows.

---

[3] In a prior-instituted litigation in the Eastern District of Texas (Case No. 2:16-CV-00741, "Texas Litigation"), the court (Judge Schroeder) held that all four patents were directed to patent ineligible subject matter under 35 U.S.C. § 101. *See Uniloc USA, Inc. v. ADP, LLC*, 279 F. Supp. 3d 736 (E.D. Tex. 2017). On appeal, the Federal Circuit affirmed the ruling as to the related '766 and '466 patents, *see Uniloc USA, Inc. v. ADP, LLC*, 772 Fed. App'x. 890, 899-902 (Fed. Cir. 2019) ("ADP"), and reversed with respect to the asserted '578 and '293 patents, *see id.* at 896-899.



The asserted '578 and '293 patents are directed to improvements in providing applications in computer networks principally for large enterprises. A computer network as envisioned by the patents connects a network management server (NMS) to "on-demand"[4] servers, which in turn are connected to client stations. Figure 1 of the '578 patent (also figure 1 of the '293 patent) is demonstrative.

---

[4] "As used herein, 'on-demand' refers to a server delivering applications as needed responsive to user requests as requests are received." '578 patent, col. 6, ll. 51-53; '293 patent, col. 6, ll. 65-67.



FIG. 1

The '578 patent addresses, *inter alia*, the "preference mobility" problem in a network. *Id.* col. 2, l. 36. "[I]ndividual users may move from location to location and need to access the network from different client stations at different times." *Id.* col. 1, ll. 51-52. In prior art systems, application preferences were generally associated with a client station rather than a user, *see id.* col. 2, l. 2 - col. 3, l. 4; and "fail[ed] to provide a seamless integration of application access and session characteristics across heterogeneous networks," *id.* col. 3, ll. 17-19.

An object of the '578 patent is the "management of configurable application programs on a computer network which allow a mix of user and system administrator defined configurable preferences to be associated with specific application programs," *id.* col. 3, ll. 42-45; and further, to "accommodate various types of hardware operating under different operating systems across client stations," *id.* col. 3, ll. 48-49.  The '578 patent discloses "providing two program files for each configurable application program which are provided to a network server station which operates as an on-demand server for software deployment and may also act as the application server."  *Id.* col. 3, ll. 51-55.  The first program file – a "configuration manager" – is available to administrators to "establish preferences for the configurable preferences of the application program which have been designated as administrator only settable."  *Id.* col. 3, ll. 59-61.  The second program file – an "application launcher" – "not only provides for a user interface to execute the application program itself but also allows a user to specify one or more of the configurable parameters of the application program."  *Id.* col. 3, ll. 64-67.

The '578 patent lists 46 apparatus and method claims, of which claim 1 is representative.

1. A method for management of configurable application programs on a network comprising the steps of:

> installing an application program having a plurality of configurable preferences and a plurality of authorized users on a server coupled to the network;

> distributing an application launcher program associated with the application program to a client coupled to the network;

> obtaining a user set of the plurality of configurable preferences associated with one of the plurality of authorized users executing the application launcher program;

> obtaining an administrator set of the plurality of configurable preferences from an administrator; and

> executing the application program using the obtained user set and the obtained administrator set of the plurality of configurable preferences responsive to a request from the one of the plurality of authorized users.

The '293 patent, in turn, is concerned with the centralized distribution of application programs in a network.

> Centralized control of software distribution is also provided for a network management server managed computer network such as a Tivoli™ environment. Application programs are distributed as file packages (packets) to on-demand servers. A profile manager import call is included in the distributed file packet along with an import text file containing the data required to properly install and register the application program on the on-demand server and make it available to authorized users. Settable on-demand server identifier fields are included to allow a plurality of on-demand servers to receive a common file packet and properly install and register the program for use locally.

'293 patent, col. 4, ll. 14-25. The '293 patent lists 21 apparatus and method claims, of which claim 1 is also representative.

> 1. A method for distribution of application programs to a target on-demand server on a network comprising the following executed on a centralized network management server coupled to the network:
>
>> providing an application program to be distributed to the network management server;
>>
>> specifying a source directory and a target directory for distribution of the application program;
>>
>> preparing a file packet associated with the application program and including a segment configured to initiate registration operations for the application program at the target on-demand server; and
>>
>> distributing the file packet to the target on-demand server to make the application program available for use by a user at a client.

The parties dispute the construction of the following six claim terms, listed in their order of importance (as agreed by the parties in their Joint Claim Construction Statement).

- "application program(s)" (all asserted claims in both patents)

- "application launcher program" (all asserted claims of the '578 patent)

- "registration operations" (all asserted claims of the '293 patent)

- "file packet" (all asserted claims of the ''293 patent)

- "executing the application program using the obtained user set and the obtained administrator set . . . responsive to a request from the one of the plurality of authorized users" ('578 patent claim 1)

- "configuration manager program" (claims 2-3, 18-19, and 33-34 of the '578 patent)

Defendants additionally assert that two groups of claims of the '578 patent – claims 20, 22, 24, 35, 37, and 39 (group 1), and claims 9, 23, 25, and 40 (group 2) are indefinite.[5]

## CLAIM CONSTRUCTION

Claim construction is an issue of law for the court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-389 (1996).  Claim terms are generally given the ordinary and customary meaning that would be ascribed by a person of ordinary skill in the art (POSITA) in question at the time of the invention.[6]  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed.

---

[5] Defendants also seek the dismissal of all claims containing means-plus-function terms on the grounds that Uniloc did not identify the corresponding function and structure.  Prior to the filing of the opening briefs, Uniloc directed defendants to its submissions in the Texas Litigation setting out its positions on the means-plus-function terms.  *See* Dkt # 45-5. Defendants, despite having identified 5 representative means-plus-function terms, *see id.*, elected not to submit them for construction.  In the absence of meaningful briefing, the court takes no position on means-plus-function or the claims containing such terms.

[6] According to Uniloc's expert witness, Dr. Michael Shamos, "a POSITA would have had at least a bachelor's degree in computer science or electrical engineering, or an equivalent field, or equivalent work experience, and, in

Cir. 2005) (en banc). In ascertaining how a person of ordinary skill in the art would have understood the terms, the court looks to the claims, the specification of the patent, and its prosecution history – collectively the intrinsic record of the patent. *Id.* at 1314-1317. Where appropriate, the court may also consider evidence extrinsic to the patent and its prosecution history, such as dictionaries, treatises, or expert testimony. *Id.*[7] Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citation omitted).

- *application program(s)* (both patents)

Uniloc contends that the claim term "application program(s)" should be given its ordinary meaning, and relies on its expert declaration for the

---

addition, at [*sic*] one year of work experience with management and distribution of application programs in a networked client/server environment." Corrected Shamos Decl. (Dkt # 42-2) ¶ 37.

[7] "[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks and citation omitted). "We have [also] viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318.

definition, namely, "software that performs tasks for an end-user." Corrected Shamos Decl. at ¶¶ 64-74.[8]

Defendants, on the other hand, note that the '578 patent's specification defines an "application program" – "as used herein, it is to be understood that the term 'application program' generally refers to the code associated with the underlying program functions, for example, Lotus Notes or a terminal emulator program." '578 patent, col. 12, ll. 13-16. Defendants also note that during the prosecution of the related '466 patent, the patentee further defined "application program" as follows.

> In other words, the "application program" is an application level software program, such as Lotus Notes, while the "application launcher program" is provided to "initially populate the user desktop" and need not include the application program code. The application launcher program interacts with the desktop, such as a user browser interface, while *an instance of the application program is requested through the desktop but executes locally at the client as a separate application from the browser interface.* For example, Lotus Notes would not execute within the browser window.

Defs.' Ex. B, '466 patent prosecution history, May 16, 2002 Appeal Brief (Dkt # 33-2) at Paychex_PTO_0000161 (emphasis added). Defendants therefore propose to integrate the two definitions and construe an "application

---

[8] Dr. Shamos, in turn, finds support for his definition from, *inter alia*, technical dictionaries, *id.* ¶ 64, and claim construction opinions for unrelated litigations and patents, *id.* ¶ 69.

program" as "the code associated with the underlying program functions that is a separate application from a browser interface and does not execute within the browser window."[9]

Uniloc agrees that the definitional statement from the '578 patent specification "confirms the ordinary meaning" of the term, Pl.'s Reply (Dkt # 45) at 7, but objects to defendants' reliance on the '466 patent prosecution history. Citing to *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097 (Fed. Cir. 2002), and *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158 (Fed. Cir. 2004), Uniloc contends that the prosecution history of the '466 patent is not a part of the intrinsic record of the '578 patent. In *Abbott Labs.*, the Federal Circuit held that although a later-filed patent (the '301 patent) shared the same inventor and assignee as the patent-in-suit (the '839 patent), and addressed the same subject matter, absent a "formal relationship" between the patents, there was no "basis for concluding that statements made about the characteristics of the surfactant claimed by the '301 patent should be attributed to the improved surfactant claimed by the '839 patent." 287 F.3d at 1105.

---

[9] Defendants point out that early in the claim construction process, Uniloc proposed a construction identical to theirs, *see* Defs.' Reply Ex. A, Plaintiff's Disclosure of Claim Terms & Proposed Construction (Dkt #44-1), which was adopted by Judge Schroeder in the Texas Litigation, *see* Texas Litigation, Dkt # 233 at 23 (E.D. Tex. Aug. 16, 2017) ("*EDTX Markman Order*").

In *Goldenberg*, two parent applications and two child patents were at issue.  The same patentee filed the two applications – the '261 and '262 applications – simultaneously.  The claims of the '261 application were rejected on double-patenting grounds over the claims of the '262 application.  In overcoming the rejection, the patentee distinguished the '262 application during the prosecution of the '261 application.  Subsequently, the '261 application matured into U.S. Patent No. 4,361,544, and a continuation of the '261 application matured into the asserted '559 patent.  The '262 application was itself abandoned, but a continuation-in-part of the '262 application matured into the '774 patent.  In construing the claims of the asserted '559 patent, the Federal Circuit approved the district court's referencing of the contents of the '262 application.  The Federal Circuit rejected, however, the district court's recitation to portions of the '774 patent that were added to the continuation-in-part.  In so holding, the Court noted the '262 application was incorporated into the '261 application's prosecution history in a manner analogous to a cited prior art reference being incorporated into a prosecution history.  *See Goldenberg*, 373 F.3d at 1167, citing *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).  What was incorporated was "content of the '262 application at the time it was distinguished from the '261 application," and "subsequently

13

added new matter is not similarly incorporated." *Id.* "In the absence of an incorporation into the intrinsic evidence, this court's precedent takes a narrow view on when a related patent or its prosecution history is available to construe the claims of a patent at issue and draws a distinct line between patents that have a familial relationship and those that do not." *Id.*

Uniloc reasons that, like the patents in *Abbott Labs.*, although the asserted '578 patent and the '466 patent share some but not all of the inventors, the same assignee, and were directed to similar subject matter, they were not continuations, divisionals, or continuations-in-part of each other, and thus have no "formal relationship" that would justify cross-referencing their prosecution histories. Further, although the '578 and '466 patents incorporate each other's application, under *Goldenberg*, only the incorporated application of the '466 patent forms a part of the '578 patent's intrinsic record. Statements made in the prosecution of the '466 patent after that incorporation, in Uniloc's view of *Goldenberg*, fall outside of the intrinsic record of the '578 patent.[10]

Uniloc's argument overlooks the pivotal fact that the '578 and '466 patents explicitly claim to be related. *See* '578 patent, col. 1, ll. 10-14 ("This

---

[10] Uniloc does not attribute a different meaning to "application program" in the '293 patent from the '466 patent, nor does it advocate for separate constructions of the term across the '578 and the '293 patents.

application is related to the following application filed concurrently herewith: METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR CENTRALIZED MANAGEMENT OF APPLICATION PROGRAMS ON A NETWORK."); '466 patent, col. 1, ll. 9-13 ("This application is related to the following application filed concurrently herewith: METHODS, SYSTEMS AND COMPUTER PROGRAM PRODUCTS FOR MANAGEMENT OF CONFIGURABLE APPLICATION PROGRAMS ON A NETWORK.").   These cross-declarations appear in the first section of each patent's written description titled "CROSS REFERENCE TO RELATED APPLICATION," a section typically reserved for listing priority patents. *See* Manual of Patent Examination Procedure (MPEP) § 601 (citing to MPEP § 211 *et seq.*).  Indeed, in addition to the related patents, the divisional patents also identify the parent patents in this section.  *See* '766 patent, col. 1, ll. 8-14; '293 patent, col. 1, ll. 9-15.[11]   Under these circumstances, the court concludes that the '578 and '466 patents share a kinship, as their drafters intended, such that their prosecution histories collectively constitute the intrinsic record for purposes of claim construction.

---

[11] In contrast, the asserted '839 patent of *Abbott Labs.* only briefly described the '301 patent in the section of the specification titled "FIELD AND BACKGROUND OF THE INVENTION."   *See* U.S. Patent Nos. 4,397,839, col. 1, ll. 26-33.  The '261 application of *Goldenberg* does not cite to the '262 application at all.  *See* U.S. Patent No. 4,361,544.

*See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

Uniloc further objects that the excerpt from the '466 patent prosecution history is inapt because it was not directed to the meaning of "application program."  In its view, "applicants were simply explaining the claimed invention of the '466 patent executed locally at the client."  Pl.'s Reply at 11.  As reflected by the table below, the excerpt from the '466 patent prosecution is offered to explain a paragraph from the '466 patent specification that defines "application program."  That specification paragraph appears nearly verbatim in the '578 patent.

| '466 patent prosecution history, May 16, 2002 Appeal Brief at Paychex_PTO_0000160-161 | '578 patent, col. 12, ll. 13-36 (parallel emphasis added for ease of comparison) |
|---|---|
| As defined in the specification of the present application: | |
| the term **"application program" generally refers to the code associated with the underlying program functions, for example, Lotus Notes or a terminal emulator program.** However, it is to be understood that the application program will preferably be included as part of the application launcher which will further include the code associated with managing usage of the application program on a network according to the teachings of the present invention. Further it is to be understood that, as used herein, the term "application launcher program" may refer to the entire program provided by a software vendor or to merely a portion thereof distributed to a client to perform particular operations. **For example, the application launcher program distributed to initially populate the user desktop preferably does not include the code associated with the underlying application program** and obtaining preferences which may only be distributed to the client later when execution of the application program is requested. The application launcher program distributed to populate the user desktop may only include a URL and an associated ICON and, possibly, code to allow obtaining of user identification and password information. Memory usage on the client stations may thereby be limited. | the term **"application program" generally refers to the code associated with the underlying program functions, for example, Lotus Notes or a terminal emulator program.** However, it is to be understood that the application program will preferably be included as part of the application launcher which will further include the code associated with managing usage of configurable application programs on a network according to the teachings of the present invention. Further it is to be understood that, as used herein, the term "application launcher program" may refer to the entire program provided by a software vendor or to merely a portion thereof distributed to a client to perform particular operations. **For example, the application launcher program distributed to initially populate the user desktop preferably does not include the code associated with the underlying application program** and obtaining preferences which may only be distributed to the client later when execution of the application program is requested. The application launcher program distributed to populate the user desktop may only include a URL and an associated ICON and, possibly, code to allow obtaining of user identification and password information. Memory usage on the client stations may thereby be limited. |
| (Specification, pp. 22-23) (emphasis added). In other words, the "application program" is an application level software program, such as Lotus Notes, while the "application launcher program" is provided to "initially populate the user desktop" and need not include the application program code. The application launcher program interacts with the desktop, such as a user browser interface, while an instance of the application program is requested through the desktop but executes locally at the client as a separate application from the browser interface. For example, Lotus Notes would not execute within the browser window. | |

Accordingly, the patentee's statement in the '466 patent defining "application program" is equally relevant to defining the same term in the '578 patent. The court therefore adopts defendants' proposed construction – an "application program" is "the code associated with the underlying program functions that is a separate application from a browser interface and does not execute within the browser window."

- *"application launcher program"* ('578 patent)

Uniloc advances an ordinary meaning construction of "application launcher program," which, in its view, is "a computer program that launches, i.e., starts another program." Defendants contend that the term is used more narrowly in the '578 patent to signify "a program distributed to a client to initially populate a user desktop and to request an instance of the application for execution at the client."[12]

With respect to "populate a user desktop," defendants point out that the specification requires that an "application launcher program [is] distributed to initially populate the user desktop." '578 patent, col. 12, ll. 26-7; *see also id.* col. 12, ll. 31-32. In response, Uniloc cites to what it contends

---

[12] Defendants note that Uniloc initially proposed to construe the term as "a program distributed to a client to initially populate a user desktop and to request execution of the application program," Defs.' Reply Ex. A, and that further, defendants' construction is the same as that adopted by the court in the Texas Litigation. *See EDTX Markman Order* at 31.

are alternative embodiments. "For example, in one embodiment, ['578 patent] at 11:32-37, the user desktop is populated before the application launcher is even distributed. And in *id.* at 11:60-12:1, the specification discloses another embodiment in which the application launcher program does not populate the user desktop." Pl.'s Reply at 2. Contrary to Uniloc's reading, the specification does not disclose populating the desktop *before* the application launcher is distributed. Rather, "the application launchers for individual application programs are distributed *when* a user desktop is initiated (populated)." *Id.* col. 11, ll. 32-34 (emphasis added). In other words, "[t]he application launcher program, as described above, is distributed for each authorized application program to the clients 24, 24', 26, 26' *at the time* of establishment of the user desktop interface." *Id.* col. 11, ll. 55-58 (emphasis added).

As for "request an instance of the application for execution at the client," defendants identify the following intrinsic evidence. In the BACKGROUND OF THE INVENTION section, the '578 patent disparages a prior art "mainframe model" where "the client device is treated as a dumb terminal with execution of the applications occurring at the server rather than the client." *See id.* col. 2, ll. 50-55. The SUMMARY OF THE INVENTION discloses that

> the present invention provides for management of configurable application programs in a network environment from a central on-demand server location while allowing for user preferences to be tracked independent of hardware location of the user. This provides for reduced costs and increased uniformity in managing software in a network environment by *delivering configured applications* when demanded by a user.

'578 patent, col. 5, l. 65 - col. 6, l. 5 (emphasis added). The DETAILED DESCRIPTION emphasizes that the servers envisioned in the patent are "on-demand" servers, *i.e.*, "server[s] *delivering* applications as needed responsive to user requests as requests are received." *Id.* col. 6, ll. 52-52 (emphasis added).[13]   The DETAILED DESCRIPTION reiterates that applications are delivered to and executed on the client.

> The application launcher applet then detects selection by the user of the application program's associated icon from the user desktop interface at clients 24, 24', 26, 26' and requests an instance of the selected one of the plurality of application programs associated with the icon from server system 22. *The application launcher program then populates clients 24, 24', 26, 26' with the instance of the selected application program for execution.*

---

[13] The court does not credit Uniloc's assertion, made without any citation, even to its own expert's declaration, that a POSITA would understand "deliver" "as simply making an instance of the application available for execution." Pl.'s Reply at 3 n.3.   Indeed, Dr. Shamos understands "deliver" to require more than simply to "make available." *See* Corrected Shamos Decl. ¶ 45 (suggesting that the '578 patent does not foreclose server-based "application launcher programs" which are not *delivered* to the client because, in his view, the patent does not require delivery).

*Id.* col. 11, l. 60 - col. 12, l. 1 (emphasis added).[14]

In addition, during the prosecution of the '766 patent, in response to the examiner's rejection on the basis that a prior art patent (Duvvoori) disclosed an application launcher program, the inventors distinguished Duvvoori on the basis of execution of the application at the client.

> Duvvoori describes either an agent process 66, 76, 96, 173 at the client, that controls execution of programs resident on the clients 18, 20, 22, or a wrapper 44, 46, 25, 38, 40, that may be at a remote server 10 or at the clients. (Duvvoori, FIG. 1). The agent processes of Duvvoori are not application specific but, instead, provide a cross-application interface for a client to the file server computer 30. (Duvvoori, Col. 9, lines 19-62). The wrappers are application specific. (Duvvoori, Col. 7, line 54 to Col. 8, line 9). However, the wrapper for the server programs on the server 10 are resident on the server with the programs. Thus, Duvvoori does not disclose or suggest the present invention's application specific application launcher program, executing at a client to request an instance of an application, also requesting a license from the license server. *In other words, while the wrappers of Duvvoori may request a license, they do not request a configurable instance of an application from a server for execution at the client as with the recited application launcher programs of the present invention.*

Defs.' Ex. F, '766 patent prosecution history, Jan. 27, 2003 Amendment (Dkt # 33-6), at Paychex_PTO_0000643 (emphasis added).

---

[14] Uniloc cautions that this recitation discusses only one embodiment of the invention and does not limit the invention as a whole. The alternative embodiment of "application launcher program," as discussed *infra*, "may refer to the entire program provided by a software vendor," and does not disclose execution on the server. *Id.* col. 12, ll. 23-24.

Uniloc's principal response[15,16] is that the attempt to distinguish Duvvoori, made in the prosecution of a patent post-dating the issuance of the '578 patent, to the extent that it raises an issue of estoppel, cannot narrow the scope of "application program launcher" in the earlier-issued '578 patent. *See Georgia-Pac. Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1333 (Fed. Cir. 1999) ("[F]or Georgia-Pacific to be bound by the statement made to the PTO in connection with a later prosecution of a different patent, the statement would have to be one that the examiner relied upon in allowing the claims in

---

[15] Uniloc additionally argues that, because the '578 discloses an embodiment of "application program launcher" that includes "the entire program provided by a software," col. 12, ll. 23-24, there is no need for the "application program launcher" to "request an instance of the application." Because the claims of the '578 patent require "installing an application program . . . on a server," claim 1, or that "the server provide an instance of the application program," claim 15, the court agrees with defendants that this is an unclaimed embodiment.

[16] Uniloc also suggests that a single reference in the '578 patent (col. 11, l. 4) to "client/server application program" discloses execution of the application program at the server. This phrase appears in the description of the step-by-step operation of Fig. 4, "an embodiment of the present invention [] described from the perspective of the application launcher program executing in a client state 24, 24'." *Id.* col. 10, ll. 47-50. The "application program launcher" is concerned with relaying the user identifier and obtaining and passing preferences to and from the in-demand server. *See id.* col. 10, l. 64 - col. 11, l. 22. The "client/server" modifier appears first in this context to denote the "client/server application environment of the illustrated embodiment of the present invention."  A "client/server application program," in similar fashion, refers to an application program in this environment.

the patent at issue."). In *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004), the Federal Circuit explained that, although statements made in the prosecution of later patents could not retroactively extend estoppel to earlier issued patents,

> [w]e did not suggest, however, that such a statement of the patentee as to the scope of the disclosed invention would be irrelevant. Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention.

*Id.* at 1350. Here, considering the ample evidence in the '578 patent specification, the '766 patent prosecution history serves to confirm the scope of "application launcher program" in the '578 patent. The court therefore adopts defendants' proposed construction and construes "application launcher program" as "a program distributed to a client to initially populate a user desktop and to request an instance of the application for execution at the client."

- *"registration operations"* ('293 patent)

To construe the term "registration operations," defendants advocate: "operations on the target on-demand server that include specifying a set of users who may access the application associated with the file packet." In its

reply brief,[17] Uniloc states that it would accept the definition of "operations that include specifying a set of [authorized] users" – "if by 'specifying the set of users' is meant either directly or indirectly (as through encryption) specifying a human user or a particular machine, or specifying a rule that will determine who will be authorized to access the application program."[18]  Pl.'s Reply at 16.  Defendants, in their turn, acknowledge that the "registration operations" may specify the authorized users directly or indirectly (such as by way of a rule authorizing members of a group).  Defs.' Reply (Dkt # 44) at 14-15; *see* '293 patent, col. 13, ll.10-13 ("The server system 22 further accepts definitions of users and groups that will access the system and the specific application (block 252).").

The court agrees with Uniloc that the specification contemplates that registration operations may include device-associated application designations.   In dependent claim 4, "registration operations include

_____

[17] Uniloc initially advocated the construction: "recording at the target on-demand server information about authorized users of the application program."

[18] Uniloc asserts, and the court agrees, that defendants' recitation of "the on-demand server" and "access for the application associated with the file packet" is redundant in the context of the claims.  *See* '293 patent, claim 1 ("preparing a file packet associated with the application program and including a segment configured to initiate registration operations for the application program at the target on-demand server").

maintaining at the target on-demand server a profile management list identifying application programs available for use by the user and wherein the method further comprises updating the profile management list at the target on-demand server to make the application program available for use by the user." The specification explains that with respect to profile management lists, "[o]ptionally, hardware client device associated designation and preferences could be provided." *Id.* col. 18, ll. 18-20. Consistent with Uniloc's interpretation, the court construes "registration operations" as "operations that include to specify, directly or indirectly, a set of authorized user or client devices."

- *"file packet"* ('293 patent)

Uniloc defines a "file packet" as a "package of one or more computer files," while defendants characterize it as "a container file that contains one or more distinct components that may be individually accessed upon opening the container file." With respect to "package" or "container file," the parties are not in a material dispute. Defendants note that Dr. Shamos testified at his deposition that a software package, like its physical analog, has a packaging material or wrapping that serves a function, such as "point to the pieces, get them out if you want to, if necessary." Dkt # 44-2, Shamos Dep. Tr. at 65. Dr. Shamos is of the view that this feature "is captured in the

word package." *Id.* at 64-65.  The court agrees with defendants that their rephrasing – "container file" – better reflects that a "file packet" has a wrapping apart from its contents.

The court agrees with Uniloc, however, that there is no disclosure in the patent that the "file packet" contains anything other than computer files within the "packet."  Defendants point to the specification's disclosure that "[t]he segment [of the file packet] configured to initiate registration operations may include an import data file and a call to an import program executing on the target station," '293 patent, col. 5, ll. 45-58, as evidence that the packet may contain a non-file component such as a "call to an import program."  The specification, however, reveals that the "call to an import program" takes the form of a command script, itself contained in a file.  *See id.* col. 19, ll. 24-34.  The court also agrees with Uniloc that defendants have not identified intrinsic evidence requiring that the component files of a "file packet" "be individually accessed upon opening the container file."  The court therefore construes "file packet" as a "container file containing one or more component files."

- *"executing the application program using the obtained user set and the obtained administrator set . . . responsive to a request from the one of the plurality of authorized users"* ('578 patent)

For the term "executing the application program using the obtained user set and the obtained administrator set . . . responsive to a request from the one of the plurality of authorized users," Uniloc relies on ordinary meaning. For their part, defendants offer the construction of "initiating execution of the application program in response to a launch request from the application launcher program using the obtained user set and the obtained administrator set."

Defendants assert, and the court agrees, that a requirement for this term is that execution of the application program is initiated only *after* having obtained the user and administrator sets ("of the plurality of configurable preferences"). *See* '578 patent, claim 8 (referring to the "executing" step as the "initiating execution step"); Fig. 3 (the last block after obtaining user preferences is "Initiating Execution of Application with User Prefs"); col. 10, ll. 30-32 (after retrieving stored user/administrator preferences or obtaining new user preferences, "[t]he application program is *then* executed at block 86 using the retrieved user set and administrator set

of configurable preferences.") (emphasis added).[19]   Uniloc objects that the sequencing reads out embodiments in which preferences are obtained after initiation but before execution is completed, but does not identify such embodiments in the patent.

The court agrees with Uniloc that the language of the claim term is otherwise easily understood and that further, defendants do not offer a persuasive rationale to require execution to be "in response to a launch request from the application launcher program" in addition to the term's recitation that execution is "responsive to a request from the one of the plurality of authorized users."   Accordingly, the court construes "executing the application program using the obtained user set and the obtained

---

[19] Defendants also point out that Uniloc described the same sequencing in its brief to the Federal Circuit appealing the Judge Schroeder's section 101 rulings in the Texas Litigation.

> When the user launches (i.e., chooses to execute) the application through the application launcher, the application provides the identity of the user to the server, which has stored the user's preferences for that application.  The program is *then* executed, with both the user preferences and the stored administrator preferences.

Defs.' Ex. D, Uniloc's Opening Appeal Brief (Dkt # 33-4), at 47 (emphasis added).  The Federal Circuit adopted this characterization in its opinion ruling in favor of the '578 patent's subject matter eligibility.   "This positioning of the components allows the application to *launch* in respons[e] to a request from one of the plurality of authorized users' *pursuant to both sets of preferences.*" *ADP*, 772 F. App'x at 898 (emphasis added).

administrator set . . . responsive to a request from the one of the plurality of authorized users" as "initiating execution of the application program using the obtained user set and the obtained administrator set . . . responsive to a request from the one of the plurality of authorized users."

- *"configuration manager program"* ('578 patent)

The only dispute concerning "configuration manager program" is whether it is necessarily a program separate from the application program.[20] Defendants assert that the specification is unequivocal that the "configuration manage program" is a distinct program.

> Management of configurable applications programs on a network is provided by using *two program files* for each configurable application program. The two program files are provided to a network server station which operates as the on-demand server for software deployment and may also act as the application server. *The on-demand server makes the first (configuration manager) program available to an administrator to obtain preferences for the configurable preferences of the application program which have been designated as administrator preferences.* The on-demand server also provides a second (application launcher) program to its client stations.

'578 patent, ABSTRACT (emphasis added); *see also* col. 4, ll. 41-43 ("[A] configuration manager program associated with the application program is distributed to a *second* client coupled to the network.") (emphasis added).

---

[20] The parties agree that the term otherwise signifies "a program that manages configuration."

In response, Uniloc, through Dr. Shamos's Corrected Declaration, points to what it contends is an embodiment in the '293 patent that discloses a configuration management program as a part of the application program it configures.  Dr. Shamos suggests that a configuration management servlet both runs on a web server and configures the web server, which is itself an application.  Corrected Shamos Decl. ¶¶ 79-83.  Although the "configuration management component 210 provides configuration tasks which are performed for users, machines and applications," '293 patent, col. 10, ll. 30-32, as reflected in Figure 3 below, the configuration management component (highlighted in blue) is a part of the Client Management Server (204) separate and apart from the applications (highlighted in green) on the user console (202).



The court therefore construes "configuration manager program" as "a program separate from the application program that manages configuration."

INDEFINITENESS

- **Group 1 claims**

In the Texas Litigation, the court ruled that claims 20, 22, 24, 35, 37, and 39 of the '578 patent were indefinite for lack of antecedent basis. *See EDTX Markman Order* at 51-55. Defendants contend that because Uniloc did not contest this ruling when it appealed the Section 101 decision to the Federal Circuit, Uniloc cannot now dispute the invalidity of these claims and assert them in this case. Uniloc, for its part, notes that Judge Schroeder rejected the Texas defendants' argument that Uniloc could not seek reconsideration of the claim construction in his case on grounds of waiver. *See* Texas Litigation, Dkt # 364 at 12 (Feb. 5, 2020).

> The Federal Circuit did not rely on the Court's constructions of "application program" or "application launcher program" to conclude that the '578 and '293 patents are directed to patent-eligible subject matter. *See generally* Docket No. 317. Accordingly, the constructions are not part of the law of the case. . . . Nor has Uniloc committed waiver. The Federal Circuit "support[s] a district court's discretion to permit parties to change their positions over the course of litigation." *WiLAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1385 (Fed. Cir. 2016). And district courts "may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Guttman,*

> *Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir.
> 2002).   The Court does not discern a reason why an interim
> appeal of an unrelated issue should deprive a party of its right, or
> the Court of its ability, to ensure that claims are properly
> construed.

*Id.*

The court agrees with defendants that, notwithstanding Judge

Schroeder's ruling in the Texas Litigation, Uniloc has committed waiver with

respect to the indefiniteness ruling.  In *Engel Industries, Inc. v. Lockformer*

*Co.*, 166 F.3d 1379 (Fed. Cir. 1999), the Federal Circuit explained that

> [t]he scope of the issues presented to this court on appeal must
> be measured by the scope of the judgment appealed from, not by
> the arguments advanced by the appellant.  To hold otherwise
> would allow appellants to present appeals in a piecemeal
> and repeated fashion, and would lead to the untenable result that "a
> party who has chosen not to argue a point on a first appeal should
> stand better as regards the law of the case than one who had
> argued and lost."

*Id.* at 1382-1383 (citations omitted).  Accordingly,

> [a]n issue that falls within the scope of the judgment appealed
> from but is not raised by the appellant in its opening brief on
> appeal is necessarily waived.  Unless remanded by this court, all
> issues within the scope of the appealed judgment are deemed
> incorporated within the mandate and thus are precluded from
> further adjudication.

*Id.* at 1383.  In the Texas Litigation, Uniloc appealed the court's judgment

dismissing all claims in their entirety.  *See* Texas Litigation, Dkt ## 269

(Judgement), 271 (Notice of Appeal).  A ruling that a claim is indefinite,

unlike an order construing a claim, is a basis to dismiss the claim. Since Uniloc did not challenge this alternative basis for dismissing the group one claims, Uniloc cannot now assert those claims.

- Group 2 claims

In defendants' view, claims 9, 23, 25, and 40 of the '578 patent suffer from the same antecedent defect as the group 1 claims found indefinite in the Texas Litigation. "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Defendants must prove indefiniteness, like other grounds of invalidity, by clear and convincing evidence. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015).

Claims 9, 25, 40 each recite "the default preferences." Of these, claim 9 is representative:

> 9. A method according to claim 1 wherein *the* default preference values are stored on a storage device coupled to the server.

(emphasis added). Claim 1, upon which claim 9 depends, does not recite a "default preferences" limitation. The court agrees with Uniloc (albeit for a different reason) that these claims are susceptible to a reasonably certain understanding in the context of the patent. The '578 patent explains that

default values exist when "[u]nder certain circumstances, preference values required to execute the application program itself may not be properly provided by either the user or the administrator." '578 patent, col. 9, ll.30-32. "If default values are required, they are obtained at block 62." *Id.* col. 9, ll. 35-36. This is precisely the step claimed in claim 8, the claim immediately preceding claim 9.

> 8. A method according to claim 1 wherein the initiating execution step includes the step of obtaining default preference values for any of the plurality of configurable preferences which are not specified by the user set or the administrator set.

Likewise, claims 24 and 39 each delineate means for performing the same step. Accordingly, claims 8, 25, and 40 are naturally read to depend on their immediately preceding claim as the parent.[21]

The court agrees with defendants, however, that claim 23 is indefinite. Claim 23 recites "the means for executing" whereas claim 17, upon which it depends, does not recite a "means for executing" limitation. Claim 17 recites a series of other "means" limitations including "means for providing an instance of the application program and a stored user set and the administrator set of the plurality of configurable preferences for use in executing the application program responsive to a request from the one of

---

[21] Defendants acknowledge that this is a potential understanding of claim 9. Defs.' Reply at 20.

the plurality of authorized users." Under 35 U.S.C. 112 para. 6, each "means" limitation is to be construed to a corresponding structure. Without an antecedent, a person of ordinary skill is unable to determine with reasonable certainty whether the structure of "the means for executing" is a further means, as Uniloc suggests, or a part of the structure corresponding to the "means for providing an instance" limitation. *See EDTX Markman Order* at 53-55.

ORDER

For the foregoing reasons, claims 20, 22, 24, 35, 37, and 39 of the '578 patent are ruled invalid on the basis of *res judicata*. Claim 23 of the '578 patent is ruled invalid on the basis of indefiniteness. The disputed claim terms will be construed for the jury and for all other purposes in these litigations in a manner consistent with the above rulings of the court.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE